J-A15042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| STEVEN G. EAKIN | : | No. 1113 WDA 2021 |

Appeal from the Order Entered September 8, 2021
In the Court of Common Pleas of Venango County Criminal Division at
No(s):  CP-61-CR-0000647-2017

BEFORE:  BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

DISSENTING MEMORANDUM BY BOWES, J.:　　　　　**FILED: MAY 2, 2023**

I respectfully dissent.  Upon review, I believe that the learned Majority misapplied the relevant factors in determining whether a violation of the Municipal Police Jurisdiction Act ("MPJA") required suppression.  For the reasons that follow, I conclude that suppression was not an appropriate remedy for the technical violation of the MPJA in this case and would therefore reverse the trial court's suppression order.

I begin with our standard of review.  "When reviewing an order granting a motion to suppress we are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate."  **Commonwealth v. Henry**, 943 A.2d 967, 969 (Pa.Super. 2008) (cleaned up).  In the case *sub judice*, the facts largely are not in dispute.  Rather, this case hinges on the trial court's application of the law to those facts.  In that

regard, "[o]ur scope of review over the suppression court's legal conclusions . . . is plenary." *Id*. (citations omitted).

From the outset, I note that I take no issue with the Majority's conclusion that Chief Sharp's extraterritorial conduct at the time of the stop was not authorized by statute. As conceded by the Commonwealth, Chief Sharp's actions were not authorized by the Intergovernmental Cooperation Act ("ICA") because the 2006 Joint Municipal Agreement, which called for Polk Borough police officers to provide police services for Frenchcreek Township, had not been adopted by ordinance in Frenchcreek Township, as was required at that time by the ICA for the agreement to take effect.[1] Additionally, the Commonwealth concedes that Chief Sharp's actions were not authorized by the MPJA as they did not fall within one of the six enumerated circumstances.

---

[1] The parties stipulated to the following recitation surrounding the interplay between Polk Borough and Frenchcreek Township:

> At the time of the traffic stop, which is the subject of this case, it occurred in Frenchcreek Township. . . . Chief Sharp observed [Eakin] operating the vehicle, which was the basis of his stop when he was in . . . Frenchcreek Township. . . . At the time of the stop, there was a Joint Municipal Agreement between Polk Borough and Frenchcreek Township for police services to be provided by officers of Polk in Frenchcreek. Frenchcreek had a resolution to adopt the agreement, but no ordinance. Polk had an ordinance as to the agreement. So, as of the time of the stop in Frenchcreek Township, Frenchcreek had no ordinance adopting the agreement.

N.T. Suppression, 8/27/21, at 68 (capitalization altered). I note the ICA has since been amended to expressly permit adoption of such an agreement by ordinance or resolution. *See* 53 Pa.C.S. § 2305.

Chief Sharp's technical violation of the MPJA, however, does not automatically compel suppression of the evidence seized as a result of the traffic stop. **See Commonwealth v. Hobel**, 275 A.3d 1049, 1058 (Pa.Super. 2022). In determining the appropriate remedy for an MPJA violation, this Court employs a case-by-case approach. **Id**. "The factors to be considered . . . consist of all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the MPJA, and the prejudice to the accused." **Id**. (cleaned up). This case-by-case approach permits "this Commonwealth's courts to tailor a remedy in situations where police intentionally have overstepped their boundaries while still affording our courts the flexibility to deny suppression when police have acted to uphold the rule of law in good faith but are in technical violation of the MPJA." **Id**. (cleaned up). Upon review, I find that the case *sub judice* is a textbook example of Chief Sharp acting "to uphold the rule of law in good faith [while] in technical violation of the MPJA[,]" and therefore the trial court erred in granting suppression.[2] **Id**.

My analysis of the first factor is guided by our Supreme Court's decision in **Commonwealth v. Hlubin**, 208 A.3d 1032 (Pa. 2019), wherein the High Court considered the intrusiveness of a sobriety checkpoint. Rather than considering the intrusiveness of a checkpoint for an unimpaired driver, the

---

[2] I note with displeasure that the trial court utterly failed to apply this test, instead concluding summarily that "[t]he remedy is suppression of the evidence" based on Chief Sharp not having the authority to stop Eakin. **See** Order of Court, 9/8/21, at 2.

- 3 -

Court concluded that it "must instead measure the level of intrusion of a stop that results in an arrest, since only in this circumstance does the issue of possible suppression of evidence arise." *Id*. at 1048. In **Hlubin**, the officer initially questioned Hlubin for 30-45 seconds and then, based upon that interaction, "removed Hlubin from her vehicle and took her to a testing area, where she was subjected to field sobriety testing, blood testing and arrest." *Id*. Our High Court determined that such an interaction "resulted in a high level of intrusiveness[.]" *Id*.

In accordance with **Hlubin**, I consider the entirety of the encounter from when Chief Sharp stopped Eakin to when Eakin was arrested to determine the level of intrusiveness. In that regard, Chief Sharp conducted a traffic stop of Eakin based upon a traffic violation. Upon observing a martini glass in the vehicle and realizing that Chief Sharp had a personal relationship with the driver, he called for another officer to conduct the traffic stop. That officer arrived and ultimately transported Eakin to a hospital for blood testing and arrest. Based on **Hlubin**, I am constrained to agree with the Majority that this interaction involved a high level of intrusiveness and thus the first factor favors Eakin. **See** Majority at 11-12.

My analysis differs from the Majority as to the second and third factors. Turning to the second factor, I consider "the extent of deviation from the letter and spirit of the MPJA[.]" **Hobel**, **supra** at 1058. This Court has held that "the spirit, or purpose of, the MPJA is to proscribe investigatory, extraterritorial forays used to acquire additional evidence where probable

cause does not yet exist." *Id*. (cleaned up). Moreover, the MPJA endeavors "to promote public safety while maintaining police accountability to local authority; it is not intended to erect impenetrable jurisdictional walls benefiting only criminals hidden in their shadows." ***Commonwealth v. Lehman***, 870 A.2d 818, 820 (Pa. 2005) (cleaned up).

Of relevance, the MPJA permits an officer to act outside his jurisdiction where he "is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property." 42 Pa.C.S. § 8953(a)(5).

Instantly, at the time of the stop, Chief Sharp was operating pursuant to a belief that his conduct in Frenchcreek Township was authorized by the ICA based on the agreement between Polk Borough and Frenchcreek Township.[3] **See** N.T. Suppression, 8/27/21, at 51 (stating that he had jurisdiction in Frenchcreek Township). Upon review, I find that he had a good faith belief that he was in Frenchcreek Township on official business.[4] While

_____

[3] I observe, again, that the 2006 agreement had been adopted by resolution in Frenchcreek Township at the time of the stop, but not by ordinance as was required by the ICA at that time. As noted, our legislature amended the ICA in 2019 expressly to permit adoption by ordinance **or** resolution. **See** 53 Pa.C.S. § 2305.

[4] While not pursued by the Commonwealth, Chief Sharp testified at the suppression hearing that he was in Frenchcreek Township while *en route* to Utica, a municipality where he stated that he also had jurisdiction. **See** N.T. Suppression, 8/27/21, at 51.

in Frenchcreek Township on what he reasonably believed to be official business, Chief Sharp observed Eakin driving his vehicle for one-half of a mile in the wrong direction on a public roadway. Unequivocally, Eakin's driving presented "an immediate clear and present danger" to other vehicles on the roadway. **See** 42 Pa.C.S. § 8953(a)(5); **Hobel**, **supra** at 1062-63 (concluding that Hobel's driving presented "an immediate clear and present danger" when he swerved back and forth across the road into the oncoming traffic lane). Under these circumstances, but for Frenchcreek Township's misguided decision to adopt the agreement by resolution instead of ordinance, Chief Sharp would have been in Frenchcreek Township on official business when he observed Eakin's dangerous driving, and therefore his conduct would have been authorized by the MPJA.

The Majority finds this factor weighs in favor of Eakin, essentially positing that the violation of the MPJA "contravenes the MPJA's policy[.]" **See** Majority at 12. I cannot countenance a conclusion that amounts to a self-fulfilling prophecy. If the second factor favors the accused whenever there is a violation of the MPJA, then every application of this test would have the second factor favoring the accused because we only apply it in circumstances where the police have violated the MPJA. In fact, such a rigid application focusing solely on police accountability ignores that the MPJA also endeavors "to promote public safety while maintaining police accountability to local authority; it is not intended to erect impenetrable jurisdictional walls benefiting only criminals hidden in their shadows." **Lehman**, **supra** at 820

(cleaned up); *see also Hlubin*, *supra* at 1048 (observing that our Supreme Court previously "held that the goals of the MPJA are the promotion of public safety while maintaining jurisdictional police lines and to expand the powers of local police to protect the public, where such expansion would not adversely affect the ultimate goal of maintaining police accountability to local authority" (cleaned up)). Given the entire letter and spirit of the MPJA, I find that its objectives were advanced by Chief Sharp's conduct in this case. Thus, I disagree with the Majority's conclusion that this factor favors Eakin.

Finally, I consider the prejudice to Eakin. *See Hobel*, *supra* at 1058. This factor requires us to consider "whether the search would not have otherwise occurred or would not have been as intrusive." *See Hlubin*, *supra* at 1048 (cleaned up). The Majority concludes that this factor favors Eakin because there was no evidence that the stop otherwise would have occurred. While it is unclear whether the search would have otherwise occurred, it is likely that any other officer pulling over Eakin would have conducted the search in the same manner as Officer Heller, who was ultimately called to the scene, transported Eakin for blood testing, and arrested him for drunk driving. Therefore, even if another officer had conducted the stop, the resulting search would have been equally intrusive. Thus, I disagree with the Majority's conclusion that the third factor favors Eakin.

Based on the foregoing, I conclude that in this case "suppression would not be an appropriate remedy under the MPJA, the legislative intent of which is to advance public safety and not shield criminal behavior." *Hobel*, *supra*

at 1064 (citation omitted).  Since I would reverse the suppression order and remand for further proceedings, I respectfully enter this dissent.